**The STATE of Ohio, Appellee,**

**v.**

**GARRARD, Appellant.**

[Cite as *State v. Garrard* (1997), 124 Ohio App.3d 718.]

Court of Appeals of Ohio,
Ninth District, Wayne County.

No. 97CA0032.

Decided Dec. 24, 1997.

*Martin Frantz*, Wayne County Prosecuting Attorney, and *John M. Williams*, Assistant Prosecuting Attorney, for appellee.

*David J. Wigham*, for appellant.

BAIRD, Judge.

On September 21, 1996, Chad E. Garrard was at home caring for his nine-year-old stepson, Tyler Close, and his three-year-old daughter, Summer.

Garrard has a history of mental illness and substance abuse. He also has a lengthy "rap sheet" of juvenile and misdemeanor convictions, including a conviction for domestic violence against his wife, for which he was on probation at the time of this crime. Garrard was feeling down that day, after having been "clean and sober" for six months. Garrard recalled having had a "happy buzz" whenever he used lysergic acid diethylamide ("LSD"), so, according to the presentence investigation report, he took a hit of LSD at approximately 8:15 a.m. A friend of Garrard's stopped by, and the two smoked marijuana together. Garrard took another hit of LSD at approximately 9:00 a.m. Garrard's wife, the children's mother, left to go shopping with a friend. She did not know Garrard had taken the LSD. Garrard then took two prescription Mellaril pills, a dose of lithium and a dose of Wellbutrin. The presentence investigation report further relates that Garrard stated that he remembered feeling like he was Jesus. At 2:00 p.m., Garrard took a third dose of LSD and felt an "overwhelming sensation of impending doom" and that his "body and soul began to feel like they were stuck in different gears." Garrard stated that as the day wore on, he "was

quickly losing touch with reality." He attempted to acquire some opium and more marijuana throughout the day; however, when an acquaintance stopped by later with some opium, Garrard believed the acquaintance was "speaking in code" and was "one of the devils."

That evening, Garrard was playing ball outside with Tyler. He began having delusions that he was the "chosen one" and that something was wrong with Summer. He heard laughter and voices. Garrard ran into the house and locked all the doors. He then ran upstairs to Summer's room, where she was sleeping, and turned on the light to wake her up. Believing that he was God and Summer was Satan, Garrard "grabbed her by the neck and threw her." At 9:05 p.m., nine-year-old Tyler dialed 911 and told police that "his father was beating his little sister." Patrolmen Cruise and Austen from the Wooster Police Department were dispatched to Garrard's home. Upon arrival, they kicked in the locked doors and discovered blood drippings on the floor and blood on the walls. Summer was screaming and her face was bleeding. The officers ordered Garrard to get down on the floor, but as they attempted to apprehend him, he struck Patrolman Austen in the face. Garrard then picked Summer up and began to violently shake her. Patrolman Cruise "maced" Garrard in order to subdue him and rescue Summer. The officers were then able to bring Garrard to the floor and handcuff him. Garrard began kicking and biting another police officer who had arrived on the scene, so the officers had to cuff Garrard's ankles as well. While in the police cruiser, Garrard attempted to kick out the window.

The Wooster Fire Department Emergency Squad reported that when it arrived at Garrard's home, Summer's nose was bloody and she had a deep laceration above her upper lip, a swollen right eye, and blood in her mouth. Summer also had some abrasions on her chest. Tyler stated that Garrard had thrown Summer against the wall. Summer was hysterical and crying out, "I want my Daddy." On the floor was a small box, covered with blood. This box, which had apparently been used as a weapon, was identified in a photograph as a door chime cover.

Summer was transported to Wooster Hospital, then to Children's Hospital Medical Center of Akron ("CHMCA"). CHMCA reported that Summer had bruises on her abdomen and lower back. She was diagnosed with a closed head injury, and her laceration was sutured.

Summer has received psychological counseling. In a letter to the Adult Probation Department, Summer's therapists state that Summer was traumatized from the beating, has nightmares about the incident, is afraid of the dark and will need longer-term counseling to help her recover.

In addition, Tyler, who witnessed the beating and called 911, suffers from nightmares and his school performance and behavior have been adversely affected.

On October 9, 1996, Garrard was indicted by a Wayne County Grand Jury for felonious assault in violation of R.C. 2903.11(A)(1), child endangering in violation of R.C. 2919.22(B), and three counts of assault in violation of R.C. 2903.13. On February 7, 1997, Garrard pled guilty to felonious assault, a felony of the second degree, and two counts of assault. The state dismissed count two, child endangering, and count four, assault. A presentence investigation was ordered. On March 12, 1997, the trial court conducted a sentencing hearing pursuant to R.C. 2929.19. The trial court sentenced, Garrard to the maximum allowable term of eight years on count one, felonious assault, and to one year on counts three and five, assault, to be served concurrently with the term for count one.

Garrard appeals, assigning one error:

"The trial court erred when it sentenced appellant to the maximum allowable prison term of eight years for the offense of felonious assault."

■ Garrard was sentenced pursuant to 1995 Am.Sub.S.B. No. 2. The purpose of a sentence imposed for a felony offense committed on or after July 1, 1996, is to punish the offender and protect the public from future crimes by the offender. R.C. 2929.11(A); *State v. Boss* (Sept. 15, 1997), Clermont App. No. CA96–12–107, unreported, 1997 WL 570701; *State v. Stewart* (Nov. 17, 1997), Madison App. No. CA96–12–057, unreported, 1997 WL 716887.

R.C. 2929.14 governs the imposition of prison terms for felony convictions, providing:

"(A) * * *[I]f the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender pursuant to this chapter * * *, the court shall impose a definite prison term that shall be one of the following:

"* * *

"(2) For a felony of the second degree, the prison term shall be two, three, four, five, six, seven, or eight years.

"* * *

"(C) * * *[T]he court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense [and] upon offenders who pose the greatest likelihood of committing future crimes."

From the record, it is clear that the trial court considered R.C. 2929.14(C) when sentencing Garrard. At the sentencing hearing, the trial court stated:

"The law of Ohio in [R.C.] 2929.14(C) says that the maximum term for a crime, which in this case is eight years, should be reserved for the worst form of that crime. In other words, when a judge thinks about what is the worst kind of felonious assault that could be committed, you've got to get to the worst category before you can think about giving somebody the maximum sentence. You also need to consider what likelihood is there that you would do this again upon release. And I've had a lot of felonious assaults in fifteen years on this court, most of them * * * some of them involved more serious injuries than your daughter suffered, but all of them involved * * * all that I can remember anyway, or a great, great majority involved defendants who committed crimes against other adults * * *."

Garrard seems to focus on the court's language regarding the nature of the injuries involved in felonious assault cases and argues that because the trial court conceded that it has seen *more serious injuries* than Summer suffered, that this could not be the *worst* type of felonious assault, as contemplated by R.C. 2929.14(C). We disagree.

The term "worst" as used in the statute connotes more than an evaluation of the victim's injuries. The trial court correctly considered the totality of the circumstances, which included the disparity in the ages and sizes of the offender and the victim, and the terror, confusion and physical pain suffered by the little girl as a result of being assaulted by her own father.

Garrard argues that because Summer suffered no permanent *physical* injuries, his crime cannot be among the "worst" type of felonious assaults. We disagree. While Summer may have fully recovered from her physical injuries, her psychological injuries will continue for a long time. We also do not agree with Garrard's assertion that Summer did not suffer serious physical injury. R.C. 2901.01(A)(5) defines "serious physical harm to persons," and provides:

" 'Serious physical harm to persons' means any of the following:

"(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

"(b) Any physical harm that carries a substantial risk of death;

"(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

"(d) Any physical harm that involves some permanent disfigurement, or that involves some temporary, serious disfigurement;

"(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering, or that involves any degree of prolonged or intractable pain."

The loss of one's front tooth has been held to be "serious physical harm." *State v. Davis* (May 24, 1984), Cuyahoga App. No. 47622, unreported, 1984 WL 5542. A two-centimeter facial cut resulting in a permanent scar has also been held to constitute "serious physical harm." *State v. Edwards* (1992), 83 Ohio App.3d 357, 360, 614 N.E.2d 1123, 1124–1125. Although Summer's *physical* injuries do not appear to be permanent, those injuries caused her substantial pain and suffering and she was temporarily disfigured and incapacitated.

In addition to determining that Garrard's assault on his daughter was among the worst types of felonious assaults, the trial court also assessed the likelihood that Garrard would repeat this type of violent crime, noting that Garrard had acted criminally as well as violently in the past. The fact is, Garrard was already a recidivist offender when he committed the present crime.

Other courts in Ohio have recently interpreted R.C. 2929.14(C). For example, in *State v. Albert* (1997), 124 Ohio App.3d 225, 228, 705 N.E.2d 1274, 1276, the trial court obtained a presentence investigation report, but also read from the police report at the sentencing hearing and detailed for the record how the defendant "crashed through the back door to the victim's home late at night, threatened her with a knife, repeatedly raped her in the presence of her children, threatened to rip her insides out, vocalized that she would be required to kill her children, and then left and set fire to the garage." In conformity with R.C. 2929.11(A), the court in *Albert* considered the need to protect the public and to punish the offender and concluded that the offenses in that case were the worst form of these offenses. Using the checklist of factors catalogued in R.C. 2929.12, the court concluded that the sentences of seven years for felonious assault and four years for arson were not contrary to law.

In another recent case, the court held that the record supported the court's determination that the defendant's offense was the "worst" type of the crime of which the defendant was convicted. In *State v. Coyle* (Oct. 13, 1997), Clermont App. No. CA97–02–014, unreported, 1997 WL 632836, the trial court considered the seriousness and circumstances of the offense, the age of the victims (under thirteen), the defendant's relationship with the victims, and concluded that "those things support the fact this is a worst form of the offense of rape which we're arguing about." *Id.*

This court dealt with a similar assignment of error in *State v. Crangle* (Aug. 6, 1997), Summit App. No. 18268, unreported, 1997 WL 460161. In that case, we affirmed the trial court's imposition of the maximum sentence on the basis that

the defendant had two prior convictions for the same offense and therefore posed a great likelihood of committing future crimes. *Id.* at 3.

█ The trial court has discretion in imposing sentence within the statutory limits. *State v. Bruce* (1994), 95 Ohio App.3d 169, 172–173, 642 N.E.2d 12, 14–15; see, also, *State v. Stewart* (Nov. 17, 1997), Madison App. No. CA96–12–057, unreported, 1997 WL 716887. R.C. 2929.19(B)(2) stated:

"The court shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed in any of the following circumstances:

"* * *

"(d) If the sentence is for one offense and it imposes a prison term for the offense that is the maximum prison term allowed for that offense by division (A) of section 2929.14 of the Revised Code, its reasons for imposing the maximum prison term[.]"

The trial court in the case at bar considered a number of factors in imposing sentence.[1] The trial court carefully set forth the factors it considered pertinent as well as its analysis in its judgment entry sentencing Garrard to eight years in prison. Specifically, the trial court considered Summer's age of three years; the trauma caused by being beaten by her father, the serious physical and psychological harm she suffered, and the fact that Garrard's relationship to Summer

---

1. R.C. 2929.12 enumerates the factors to be considered by the trial court when imposing a felony sentence, when those factors are applicable. R.C. 2929.12(B) provides that the court shall consider the following factors in determining if the offender's conduct is more serious than conduct normally constituting the offense, as well as any other relevant factors. The applicable factors with regard to Garrard's felonious assault on Summer are:

"(1) The physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the * * * age of the victim.

"(2) The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense.

"* * *

"(6) The offender's relationship with the victim facilitated the offense."

R.C. 2929.12(C) requires the court to consider substantial grounds for mitigation, although those grounds do not constitute a defense, as well as any other relevant factor regarding the offender, the offense, or victim when determining that the offender's conduct is less serious than conduct normally constituting felonious assault.

R.C. 2929.12(D) requires the court to consider, *inter alia*, the following applicable factors when determining if the offender will likely commit future crimes, as well as any other relevant factor:

"(2) The offender previously was adjudicated a delinquent child pursuant to Chapter 2151. of the Revised Code, or the offender has a history of criminal convictions. ·

"(3) * * *[T]he offender has not responded favorably to sanctions previously imposed for criminal convictions."

R.C. 2929.12(E) requires the trial court to consider five enumerated factors, if applicable, as well as any other relevant factors, in determining if the offender is not likely to commit future crimes. The only applicable factor provides:

"(5) The offender shows genuine remorse for the offense."

facilitated the offense. In addition, the trial court found that Garrard had both a juvenile and adult record, was on probation for domestic violence against his wife (Summer's mother), had failed to respond favorably to probation and had never dealt seriously with his drug and alcohol problem. The trial court also considered that Garrard had voluntarily ingested LSD and several other drugs while purportedly caring for two young children. The trial court did not believe that Garrard showed genuine remorse for his offense.

Garrard argues that the trial court did not consider any mitigating factors when it sentenced Garrard. A presentence investigation was conducted and the trial court had before it volumes of information concerning Garrard, including his medical records, his own written statements and letters from family members written on Garrard's behalf. Garrard also testified in his own behalf at the sentencing hearing. The trial court explicitly stated its reasons for sentencing Garrard to the maximum allowable term both at the sentencing hearing and in its judgment entry. That the trial court mentioned no mitigating factors indicates that the trial court found none.

Garrard's assignment of error is overruled. The judgment of the trial court is affirmed.

*Judgment affirmed.*

DICKINSON, P.J., and SLABY, J., concur.